## BURROUGHS CORPORATION

v.

## The UNITED STATES.

No. 251–78.

United States Court of Claims.

March 19, 1980.

Raymond S. E. Pushkar, Washington, D. C., attorney of record, for plaintiff. Sellers, Conner & Cuneo, Washington, D. C., of counsel.

Alvin A. Schall, Brooklyn, N. Y., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

KUNZIG, Judge:

This is a suit for proposal preparation costs by a disappointed offeror in a *negotiated procurement* for an automatic data processing (ADP) system. Plaintiff argues the award of an ADP contract by the Mine Enforcement and Safety Administration (MESA) to a competing offeror, Honeywell Information Systems, Inc., (Honeywell) was arbitrary and capricious under the standards delineated in *Keco Industries, Inc. v. United States*, 192 Ct.Cl. 773, 428 F.2d 1233 (1970) (hereinafter, "*Keco I*") and *Keco Industries, Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200 (1974) (hereinafter, "*Keco II*").[1] Consequently, plaintiff seeks reimbursement for the costs it incurred in preparing its proposal. Plaintiff's motion for summary judgment under Rule 101 was met with a cross-motion for summary judgment by the Government, which brings the case before us. We conclude the actions of the Government, as represented by the contracting officer, were not arbitrary and ca-

pricious toward the plaintiff-offeror, Burroughs. Therefore, plaintiff's claim for proposal costs is denied.

## I.

## FACTS

The procurement in dispute began with a Request for Proposals (RFP) No. S2751008 issued by MESA, United States Department of the Interior,[2] on July 1, 1975. The RFP, sent to sixty-one potential vendors, sought proposals for the acquisition by MESA of an ADP computer system for a sixty-five month period, if option rights under the contract were completely exercised.

■ To be eligible for award of the fixed-price contract contemplated by this particular negotiated procurement RFP, an offeror had successfully to pass specified "benchmark" tests utilizing the equipment it proposed to furnish under the contract. Award was to be made to the offeror submitting the lowest priced offer (as evaluated) of those offerors who had successfully passed the benchmark tests. But the Government was completely free to reject any or all offers received. The RFP also required that the successful offeror rerun the benchmark tests upon installation of the computer system under the contract.

Plaintiff Burroughs, Honeywell, and other companies submitted timely proposals. In late November and early December, MESA determined that plaintiff and Honeywell had successfully passed the benchmark tests, and thus were eligible for award.

On December 16, 1975, MESA informed plaintiff and Honeywell they were required to submit their "best and final" offers no later than 2:00 p. m. EST on December 31, 1975. The office of MESA's contracting

---

1. *Keco I* and *Keco II* are this court's primary cases discussing a disappointed bidder's right to sue for bid preparation costs against the Government. *Keco I* was before the court on defendant's motion for summary judgment, which was denied; the case was remanded to the trial division. On the merits, the trial judge concluded plaintiff was not entitled to bid prep-

aration costs. The court agreed with this conclusion in its opinion in *Keco II*.

2. Under Pub.L.95–164, 91 Stat. 1290, MESA became the Mine Safety and Health Administration and was transferred from the Department of the Interior to the Department of Labor.

officer for the procurement was in Denver, Colorado. But to give the offerors more time for offer preparation, the contracting officer authorized the delivery of best and final offers to MESA's headquarters in Arlington, Virginia, though he was in Denver, since both plaintiff and Honeywell prepared their offers at their respective offices in nearby McLean, Virginia.

Plaintiff submitted its best and final offer to MESA at 1:30 p. m. EST in Arlington, Virginia, on December 31, 1975. Honeywell submitted its best and final offer at 1:50 p. m. Honeywell's offer, however, was accompanied by a letter which stated in pertinent part:

> * * * The enclosed cost tables contain an error. They are currently being reprinted and will be in your hands by 3 PM today. The arithmetic error is approximately $120,000 in evaluated cost and will result in an increase in cost to the tables enclosed.

The contracting officer (in Denver) was advised of these circumstances by telephone at about 2:00 p. m. EST on December 31, 1975. Plaintiff's lowest offer was for an estimated evaluated price of $1,944,561 for a proposed "systems life of 65 months." Honeywell's "uncorrected" cost tables reflected an estimated evaluated price of $1,784,395. The contracting officer by telephone accepted Honeywell's statement of an arithmetic error of approximately $120,000 and decided that $120,000 would be the maximum change to the cost tables that he would accept. Thus, the contracting officer *determined Honeywell had submitted an acceptable offer consisting of the original*

*$1,784,395 stated in its proposal plus the $120,000 indicated in its letter for a total of $1,904,395*; substantially below plaintiff's offer of $1,944,561. Honeywell's corrected cost tables were delivered shortly thereafter at 2:45 p. m. EST. The tables indicated a total estimated evaluated price of $1,877,749, an increase of only $93,354 over the "uncorrected" cost tables but well within the error of "approximately $120,000" noted in the earlier communication. With the belief he was acting within the authority of Section I.7 of the RFP,[3] ("Late Offers and Notification of Withdrawals") the contracting officer considered the $93,354 change to be a late modification of an otherwise successful proposal which made the proposal more favorable to the Government. Honeywell's bid was deemed acceptable on the basis of its corrected cost tables (the full value of said correction having been publicly and timely submitted prior to 2:00 p. m. December 31, 1975).

On January 1, 1976, the Burroughs and Honeywell proposals were brought to Denver for further evaluation. Both proposals were found to be technically responsive to the requirements of the RFP by the benchmark committee and MESA's technical evaluation committee. The proposals were also reviewed during the first week of January 1976 by a contract specialist on the contracting officer's staff, Kathryne Hughes. Miss Hughes discovered that Honeywell's best and final offer did not mention, nor did it show, several system components which had been shown on Honeywell's benchmark proposal. The three missing components were one MXF

---

**3.** Section I.7 of the General Instructions of the RFP provided:

> "I.7. LATE OFFERS AND MODIFICATIONS OR WITHDRAWALS
>
> "(a) Any proposal received at the office designated in the solicitation after the exact time specified for receipt will not be considered
>
> * * * * * *
>
> "(b) Any modification of a proposal, except a modification resulting from the Contracting Officer's request for 'best and final' offer, is subject to the same conditions as in (a)(1) and (a)(2) of this provision.

> "(c) A modification resulting from the Contracting Officer's request for 'best and final' offer received after the time and date specified in the request will not be considered unless received before award and the late receipt is due solely to mishandling by the Government after receipt at the Government installation.
>
> * * * * * *
>
> "(e) Notwithstanding (a), (b), and (c) of this provision, a late modification of an otherwise successful (selected) proposal which makes its terms more favorable to the Government will be considered at any time it is received and may be accepted."

6004, one MTF 1045 and one MTF 1041.[4] Miss Hughes mentioned these omissions to the contracting officer, who was assured by a representative of Honeywell that the omissions were not significant in nature. Indeed, they were the same items already timely covered by the price correction Honeywell submitted at 1:50 p. m. on December 31, 1975, and had already been approved in the earlier benchmark proposal for technical proficiency. Honeywell submitted corrected pages of its best and final offer reincorporating the missing components. Based on Honeywell's assurances and the reports of the benchmark and technical evaluation committees, the contracting officer determined that the Honeywell proposal was technically responsive.[5]

The two proposals were also evaluated for cost computation accuracy. MESA found that both Burroughs and Honeywell had not computed costs as specified in the RFP and reevaluated the prices as follows: Honeywell at $1,884,874; Burroughs at $1,977,816. The contracting officer awarded the contract to Honeywell on February 10, 1976, as the lowest priced offer which had passed the benchmark tests and was technically acceptable. On June 21, 1976, after it had been installed, the Honeywell system successfully passed the rerun of the benchmark tests as called for by the contract.

By letters dated April 12 and June 28, 1976, to the Comptroller General of the United States, plaintiff protested the contract's award to Honeywell on a variety of grounds. In the decision, *Burroughs Corp.*, 56 Comp.Gen. 142 (1976), 76–2 CPD ¶ 472, *on reconsideration*, 56 Comp.Gen. 506 (1977), 77–1 CPD ¶ 256, plaintiff's protest was sustained and a recompetition of the contract,

between Burroughs and Honeywell only, was recommended. Upon review of the facts the Comptroller General found, *inter alia:*

(1) Section II.2.1 of the RFP required offerors to propose "fixed prices, or prices which can be finitely determinable" for the initial contract and option periods. Honeywell's submission of its proposal at 1:50 p. m. on December 31, 1975, with the qualification that it contained an error of "approximately $120,000" failed to meet this requirement.

(2) Because, in the Comptroller General's view, Honeywell did not submit a legitimate offer before the 2:00 p. m. deadline, Honeywell's delivery of its "corrected cost tables" at 2:45 p. m. had to be considered a late offer under the RFP's "Late Offers and Modifications or Withdrawals" clause and was barred by that provision.

(3) The technical portion of Honeywell's best and final communication proposed equipment different from that previously proposed and benchmark tested. That is, Honeywell's best and final offer lacked the three systems components mentioned above. The contracting officer improperly permitted Honeywell to correct these technical errors after the closing date.

In view of the foregoing deficiencies the Comptroller General ordered a recompetition and affirmed the decision on reconsideration. *Honeywell Information Systems, Inc.*, 56 Comp.Gen. 506 (1977), 77–1 CPD ¶ 256.

In August 1978 MESA (which by that time had become the Mine Safety and Health Administration, MSHA, of the Department of Labor) provided the Comptroller General new information concerning its

---

**4.** The MXF 6004 is the computer system's IOM ("input-output" multiplexer) expansion unit. As such, it augments the IOM, the component which connects the computer system's central processing unit with the system's peripheral devices, such as its tape and disk drives. The MTF 1045 is a code translator; the benchmark proposal showed two of these, while the best and final offer only showed one. Finally, the MTF 1041 is a component which is part of the computer system's magnetic tape system.

**5.** Recognizing this situation the Comptroller General stated in an initial decision: "Consequently, it seems that the 'arithmetic' error referenced by Honeywell might well have been caused by its inadvertent failure to include the IOM expansion and code translators it proposed and benchmark tested." *Burroughs Corp.*, 56 Comp.Gen. 142 (1976), 76–2 CPD ʳ 472 at p. 10–11. This implication was confirmed during oral argument of the case before this court by defendant's attorney.

ADP needs indicating it was impossible to comply with the restricted recompetition recommendation. Instead, MSHA wished to enter into a new, fully competitive procurement to meet its expanding data processing needs. After audit of MSHA's information, the Comptroller General in February 1979 withdrew the prior recommendation of a restricted procurement.

We note that nowhere in the entire consideration of the case, neither in his decision of December 9, 1976, nor his reconsideration of April 13, 1977, nor in his final reconsideration of February 1979, did the Comptroller General ever mention any possible entitlement of Burroughs to proposal preparation costs.

## II.

## POSITIONS OF THE PARTIES

Plaintiff's position may be simply stated. This court's decision in *Keco Industries, Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200 (1974), (*Keco II*), plaintiff contends, held that a bidder-claimant is entitled to bid preparation costs when the Government's conduct toward that bidder is "arbitrary and capricious." *Keco II, id.* at 574, 492 F.2d at 1203. A major factor to be considered in judging whether the Government's conduct has been arbitrary and capricious is whether there has been a "proven violation of pertinent statutes or regulations." *Keco II, id.* at 574, 492 F.2d at 1204. Here, plaintiff insists, the facts found and conclusions reached by the Comptroller General establish clearly that the conduct of the contracting officer violated the terms of the RFP, applicable regulations and the basic tenets of sound procurement policy. Had the contracting officer properly administered this procurement, he would have had no choice but to deem Honeywell's proposal unacceptable and would have been forced to award the contract to the only qualified offeror, Burroughs. Therefore, plaintiff urges that (even though it failed to allege there was any arbitrary and capri-

cious action with respect to the evaluation of its proposal) because Burroughs would have received the contract were it not for the mistakes made in evaluating and accepting Honeywell's proposal, the Government's conduct toward plaintiff was arbitrary and capricious.

For its part, defendant vehemently argues that while there may have been minor irregularities in the ADP contract award (anticipated by section I.9(b) of the RFP), nothing occurred which rises to the level of arbitrary and capricious conduct. Defendant emphasizes that in this situation of negotiated procurement, the contracting officer was vested with a far greater measure of discretion than exists in a procurement utilizing formal advertising. The actions he took were pursuant to the exercise of this discretion and with the intent of avoiding the elimination of one offeror in a procurement where only two offerors remained. Defendant points out that plaintiff failed even to *allege* bad faith conduct on the part of the contracting officer, proof of which is a crucial factor under the *Keco II* standards; thus plaintiff's burden of proof is substantially greater than it would be otherwise. Defendant further claims that Burroughs' proposal was technically unacceptable; since Burroughs would thus have been barred from award, it cannot complain that the Government's action vis-á-vis Honeywell deprived it of the contract.[6]

Finally, we note again in passing, that the Comptroller General never even mentioned Burroughs' possible entitlement to proposal preparation costs in his three decisions and further, that the Government in any event, had the right to reject *all* offers if it so desired, under section I.9 of the RFP.

## III.

## THE COMPTROLLER GENERAL'S DECISIONS

 Before analyzing the factors enumerated in *Keco II* for the recovery of

---

**6.** After examining defendant's argument on this point and plaintiff's reply, we cannot say that Burroughs' proposal was technically unacceptable, especially in view of its approval by

both the technical evaluation and benchmark committees. Both proposals, Honeywell's and Burroughs', were approved by both committees.

proposal preparation costs it is necessary to clarify the impact the Comptroller General's findings and conclusions have on the question before us. The Court of Claims is not bound by the views of the Comptroller General nor do they operate as a legal or judicial determination of the rights of the parties. *See Font v. United States*, 219 Ct.Cl. ——, 593 F.2d 388 (1979). In this particular case the parties do not dispute the Comptroller General's *factual* conclusions, consequently there is no reason for this court not to accept these facts on cross-motions for summary judgment. Insofar as the legal conclusions of the Comptroller General are concerned, he determined that award of the contract to Honeywell was improper. Regardless of whether the court agrees with this legal conclusion, *Keco II* states that "proven violation of pertinent statutes or regulations can, *but need not necessarily*, be a ground for recovery [of proposal preparation costs]," (emphasis added). 203 Ct.Cl. at 574, 492 F.2d at 1204. The questions of legal error in a procurement, and entitlement to "bid" or "proposal" preparation costs are therefore quite distinct. The Comptroller General decided the former question, not the latter; we have only the *latter* before us. Furthermore, even in cases where the Comptroller General has found the existence of clear legal error on the Government's part, "bid" preparation costs have been denied.[7]

■ The point is, the Comptroller General's earlier decisions do not by any means mandate that plaintiff is entitled to its proposal preparation costs. Such entitlement can be determined only after scrutiny of the *Keco* factors. And where, as here, the Government error concerns only the prevailing proposal and not the claimant's own rejected proposal, there must be "a careful examination of the claimant's particular rights and interests with respect to that specific type of misconduct." *Keco II*, 203 Ct.Cl. at 578, 492 F.2d at 1206; *see* section IV, *infra*.

## IV.

### THE KECO II CRITERIA

■ The opinion in *Keco II* sets forth four general criteria controlling entitlement to "bid" preparation costs. *Keco II*, 203 Ct.Cl. at 574, 492 F.2d at 1203–04. Subjective bad faith on the part of procuring officials will normally warrant recovery of these costs. Not far removed from the bad faith test is the second factor, proof that there was "no reasonable basis" for the administrative decision. Action by the Government which has no reasonable basis, the court noted, is often equated with conduct motivated by subjective bad faith. *Keco II, id.* at 575, 492 F.2d at 1204. Next, the degree of proof of error is related to the amount of discretion entrusted to the procurement officials by applicable statutes and regulations, i. e., the greater the discretion granted to a contracting officer, the more difficult it will be to prove the decision was arbitrary and capricious. Fourth, a proven violation of pertinent statutes or regulations is not necessarily, but can be, a ground for recovery. Application of these principles depends upon the type of dereliction committed by the Government and whether the dereliction occurred with respect to claimant's *own* bid or that of a *competitor*.

Several of the above factors are especially relevant to resolution of this particular case. First, there is no suggestion whatsoever of subjective bad faith on the part of the contracting officer or any evidence contrary to the presumption that he, as a public official, acted conscientiously in the discharge of this duty. *Librach v. United States*, 147 Ct.Cl. 605, 612 (1959). Bad faith was not even alleged. Because the principle of action "without any reasonable basis" is closely related to the bad faith test, it is highly unlikely the conduct of the Government can be said to have had "no reasonable basis."

■ It is also of key significance that the procurement in this case was conducted

7. *See University Research Corp.*, Comp.Gen. Dec. B–186311, Feb. 3, 1978, 78–1 CPD ¶ 98; *Harco Inc.*, Comp.Gen.Dec. B–189045, Jan. 26, 1979, 79–1 CPD ¶ 55.

in the context of *negotiation* rather than by *formally advertised bidding*. In formally advertised bidding the pertinent statutes and regulations are far more strict about the conduct of the procurement than in a negotiated one, consequently in negotiated procurement the contracting officer is entrusted with a relatively high degree of discretion. For example, in formal advertising, a contracting officer is prohibited from considering a bid which does not conform to the invitation for bids. *See* 10 U.S.C. § 2305(c) (1976), Nash & Cibinic, Federal Procurement Law 345 (3rd ed. Vol. I, 1977). Yet this concept is *not* applicable to negotiation, where the contracting officer is permitted to conduct oral or written discussions with offerors whose proposals vary from the RFP.[8] Nash & Cibinic, *supra*. Remarking on the contracting officer's discretion in negotiation the court in *Sperry Flight Systems Division v. United States*, 212 Ct.Cl. 329, 339, 548 F.2d 915, 921 (1977) noted that ". . . the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for . . ." and that, "effective contracting demands broad discretion." Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was "arbitrary and capricious" is certainly much heavier than it would be in a case of formal advertising. *See Keco II*, 203 Ct.Cl. 574, 492 F.2d at 1204.

Finally, it must be emphasized that in this case we are not dealing with an allegation of error with respect to plaintiff's proposal, but derelictions regarding the proposal submitted by plaintiff's competitor, Honeywell. The duty of the Government to treat a proposal honestly and fairly runs first of all to the enterprise submitting that proposal. *Keco II, id.* at 577, 492 F.2d at 1205. This is so in part because when a disappointed offeror challenges the evaluation and award of a contract to another offeror, it simply cannot be said the rejected offeror has been harmed thereby because there is no assurance the rejected offeror would have otherwise won the contract. Plaintiff herein vigorously asserts that since Honeywell's proposal was unacceptable, it should have been rejected leaving plaintiff the only remaining offeror eligible for award. This assertion ignores the actual circumstances. As a matter of legal obligation, the RFP in section I.9 expressly reserved the right of the Government to "reject any or all offers."[9] *See American General Leasing, Inc. v. United States*, 218 Ct.Cl. ——, ——, 587 F.2d 54, 59 (1978). Furthermore, as we have mentioned, *supra*, the contracting officer, upon discovery of any irregularities in Honeywell's proposal, had the authority to engage in discussions and call for another round of best and final offers. He would not have been required to award the contract to plaintiff. Even the Comptroller General did not order award to plaintiff; he ordered recompetition.[10] In summary, it is highly questionable whether plaintiff has necessarily been harmed by the alleged misconduct of the Government.

## V.

## ANALYSIS

The specific actions of the contracting officer which plaintiff complains were arbitrary and capricious are: (1) his decision that Honeywell had submitted an acceptably firm price though its proposal was qualified by an increase of "approximately" $120,000; (2) his determination that Honeywell's proposal was technically responsive and his acceptance of the corrections

---

8. This process is often referred to as "curing."

9. I.9(b) of the RFP stated: "The Government reserves the right to reject any or all offers and to waive informalities and minor irregularities in offers received."

10. In fact had there been a recompetition, it is entirely possible plaintiff, for any one of a number of reasons, could have lost proposal preparation costs a second time.

Honeywell provided, which supplied the "missing" computer systems components, without also conducting discussions with plaintiff as mentioned in 41 C.F.R. § 1–3.-805–1 (1979).

▮▮▮▮ Before addressing these points we are constrained to emphasize once again the limited nature of our decision. We decide only whether the contracting officer's actions were arbitrary and capricious under *Keco II*. The contracting officer's compliance, *vel non*, with the RFP and applicable regulations impinges upon this question in some degree, but it is merely one factor we consider in the broader context of his discretion, the reasonableness of and motivation for his decisions and whether the regulations allegedly violated were designed for the benefit of the plaintiff-offeror. The narrower question of whether the contract award was proper is not before us. In any event, to conclude that an offeror is automatically entitled to its proposal preparation costs because the Government may have violated (or hypothetically did violate) the terms of the RFP or certain regulations drastically oversimplifies the approach outlined in *Keco II*.

▮▮▮▮ We turn first to plaintiff's complaint that the contracting officer was arbitrary and capricious by accepting Honeywell's proposal with its increase of "approximately" $120,000. Plaintiff makes no suggestion at all that the contracting officer was motivated by bad faith in accepting this proposal. Instead, it is clear the contracting officer as shown by his affidavit had sought to avoid the situation of a sole source procurement, for that would have been, realistically speaking, exactly the result if he had excluded Honeywell's proposal. Sole source procurements are strongly discouraged by the procurement regulations which state that all purchases are to be made on a competitive basis to the maximum practicable extent. 41 C.F.R. § 1–1.-

301 (1979). As far as the contracting officer knew, the error Honeywell wanted to correct was nothing more than an arithmetic one in a long, detailed and complex set of cost tables. Moreover, since the contracting officer treated the $120,000 "approximate" increase as the maximum he would accept, Honeywell's proposal was still $40,166 less than Burroughs'.

Furthermore, plaintiff's attack against the contracting officer's decision to accept the "approximate" price proposal is based on a weak position since the requirement of including a price in negotiated proposals was never intended for the benefit of offerors, especially not for disappointed offerors. As the court noted in *Keco II*, "Not every regulation is established for the benefit of bidders as a class, and still fewer may create enforceable rights for the awardee's competitors." 203 Ct.Cl. at 578, 492 F.2d at 1206.[11] An examination of the legislative history behind the price requirement in negotiated procurement reveals the purpose of the requirement is to save the Government money, not to give offerors enforceable rights vis-à-vis other offerors.

The requirement of price submissions in negotiated procurements stems from 10 U.S.C. § 2304(g) (1976) which provides in pertinent part:

> (g) In all negotiated procurements in excess of $10,000 in which rates or prices are not fixed by law or regulation and in which time of delivery will permit, proposals, including price, shall be solicited from the maximum number of qualified sources consistent with the nature and requirements of the supplies or services to be procured, and written or oral discussions shall be conducted with all responsible offerors who submit proposals within a competitive range, price, and other factors considered.

The key words, "including price," however, were not made a part of the statute

---

11. *Keco II* also concluded in this regard that, "The point is that, in those instances in which the alleged Government wrongdoing concerns only the prevailing bid and not the claimant's own rejected proposal, there should be careful examination of the claimant's particular rights and interests with respect to that specific type of misconduct. There may well be no one umbrella rule or principle for all such cases." *Id.* at 578, 492 F.2d at 1206.

until passage of Pub.L.90–500, 82 Stat. 851 (1968).[12] They were added as a result of Congressional reaction to a solicitation by the Army for M–16 rifles which required technical proposals only without mention of price. The legislation inserting a price requirement was introduced "for the express purpose of prohibiting in the future the waste of public funds which occurred . . in the M–16 Contract awards." 114 Cong. Rec. 20736, 90th Cong.2d Sess. (July 11, 1968). The purpose of the price requirement, therefore, was to save the Government money, it was not enacted for the "benefit of bidders as a class." *Keco II*, 203 Ct.Cl. at 578, 492 F.2d at 1206. In conjunction with the commendable intent of the contracting officer of avoiding a sole source procurement, and considering that Burroughs raised no suggestion of bad faith, this factor compels us to conclude his conduct was not arbitrary and capricious toward plaintiff under *Keco II* standards.

■ Plaintiff's second contention, that the contracting officer was arbitrary and capricious by finding Honeywell's proposal technically responsive and accepting the changes Honeywell offered without conducting discussions with plaintiff is equally unpersuasive. To begin with, "Because of the broad discretion vested in the contracting officer to determine whether a proposal is technically acceptable, plaintiff has an unusually heavy burden of proof in showing that the determination made in this regard was arbitrary and capricious." *Continental Business Enterprises, Inc. v. United States*, 196 Ct.Cl. 627, 637, 452 F.2d 1016, 1021 (1971). The Honeywell proposal was scrutinized by *both* the technical evaluation and the benchmark committees and found to be technically acceptable. Plaintiff might argue the committees were negligent or did not exercise due diligence by failing to discover the absence of the three computer components from Honeywell's proposal.

The point of *Keco II*, however, is that such negligence on the part of the Government does not entitle a "bidder" to preparation costs.

The committee approvals had been issued when the contracting officer was told by Miss Hughes that three components were missing from Honeywell's proposal. The contracting officer called Honeywell, was assured the omissions were minor, and accepted corrected pages of the Honeywell proposal which reincorporated the three missing components. No variation at all from the RFP's actual requirements was contemplated by the technical corrections Honeywell submitted. Nor was there any change in Honeywell's overall price by addition of the three components, because the price differential was covered by Honeywell's earlier submission of its price change. Since the technical evaluation and benchmark committees had determined Honeywell's proposal was technically responsive and the corrections Honeywell submitted involved (at that time) no change in price, the contracting officer had no reason to suspect the technical changes Honeywell made were anything other than "informalities and minor irregularities" the correction of which he could permit under section I.9(b) of the RFP. Certainly such a conclusion would not be arbitrary and capricious.[13] If it is assumed the corrections were informalities or minor irregularities, then the failure to conduct discussions with all other competing offerors as called for by 41 C.F.R. § 1–3.805–1 is significantly lessened, insofar as whether the failure was arbitrary and capricious. In fact the Defense Acquisition Regulations in dealing with military procurement specifically permit the correction of minor mistakes and errors in a proposal, at the request of an offeror, and provide that such correction will not constitute a discussion with regard to the require-

---

**12.** S.3293, 90th Cong., 2d Sess. 1, *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 985, 988.

**13.** The decision of whether a deviation or error constitutes a waivable informality is, naturally, one of discretion and judgment. *See Excavation Construction Inc. v. United States*, 204 Ct.Cl. 299, 308, 494 F.2d 1289, 1293 (1974).

ment of conducting discussions with all other offerors.[14]

Therefore, we conclude that the contracting officer's decision to accept the technical changes submitted by Honeywell and yet not reopen discussions with plaintiff was entirely reasonable and not arbitrary and capricious.

■ To summarize: (1) the contracting officer's acceptance of Honeywell's price modification proceeded not from bad faith, but out of a regard for the policy of maintaining maximum competition in contract awards; (2) bad faith was never even alleged, much less proved. Moreover, (3) since the requirement of price submissions in negotiated procurements is designed to save the Government money, not for the benefit of competing offerors, plaintiff's assertion of a protectable interest in the enforcement of the price requirement has little support.

■ As for plaintiff's complaint concerning the changes Honeywell made in its technical proposal, (4) it would have been reasonable for the contracting officer to treat such changes as the correction of minor irregularities, in view of the proposal's earlier acceptance by the technical evaluation and benchmark committees. Furthermore, these changes had already been benchmark tested and accepted prior to proposal submission on December 31, 1975. (5) If the Government was in any way negligent, *Keco II* holds that mere negligence on the part of the Government does not entitle a "bidder" to preparation costs.

■ Finally, when we add to these factors (6) the discretion given to Government officials in negotiated procurement, (7) the uncertainty that plaintiff would have won the contract regardless of the derelictions alleged, (8) the fact plaintiff complains of errors in the evaluation of a competitor's proposal, not his own, and (9) plaintiff's heavy burden of proof, we must conclude the actions of the Government toward plaintiff were not arbitrary and capricious.[15]

We so hold.

Accordingly, upon consideration of the parties' submissions and after oral argument, plaintiff's motion for summary judgment is denied. Defendant's cross-motion for summary judgment is granted and the petition is dismissed.

---

**14.** DAR (ASPR) 3–805.5(d)(3), under "Disclosure of Mistakes Before Award" provides:

(3) If an offeror requests permission to correct a mistake in his proposal, a determination permitting the correction may be made, provided both the existence of the mistake and the proposal actually intended are established by clear and convincing evidence ascertainable from the solicitation and the proposal, and such correction shall not be considered *discussions* within the meaning of this paragraph 3–805. If, however, establishing the mistake and the intended proposal requires reference to documents, worksheets, or other data outside the solicitation and the proposal, then the correction of such a mistake may be accomplished only through the conduct of discussions with offerors in accordance with this paragraph 3–805. If the above determination cannot be made, and the contracting officer still contemplates award without discussions, the offeror shall be given the opportunity to withdraw or to verify his proposal.

Honeywell had passed the benchmark test with a specific computer configuration and the RFP required that its proposal conform to the configuration which had been benchmark test-ed. Honeywell's failure to include this same configuration in its proposal was most likely, as the Comptroller General found, inadvertent. This inadvertent error could have been easily discovered by comparison of Honeywell's proposal to its benchmark configuration and thus would be within the policy of the above cited provision.

**15.** The differences between this case and *McCarty Corp. v. United States*, 204 Ct.Cl. 768, 499 F.2d 633 (1974), in which we awarded bid preparation costs, are substantial and obvious. In *McCarty* the contracting officer improperly corrected a bid of a competing bidder with the result of displacing plaintiff's otherwise low bid. The officer furthermore had refused a proper request by plaintiff to correct its bid. The case was one of advertised bidding, not negotiation. Were it not for the clearly improper actions of the contracting officer, plaintiff in *McCarty* would have won the contract. Finally, plaintiff complained of derelictions in the evaluation of its own bid as well as that of a competitor. The actions of the contracting officer discriminating against plaintiff and wrongfully favoring a competitor in *McCarty* were tantamount to constructive bad faith.