**SMS DATA PRODUCTS GROUP, INC., Appellant,**

v.

**Richard G. AUSTIN, Administrator of General Services, Appellee.**

**Nos. 91–1060, 91–1061.**

United States Court of Appeals, Federal Circuit.

July 30, 1991.

Frederick W. Peters, of Williams & Connolly, Washington, D.C., submitted for appellant.

Elizabeth S. Woodruff, of the Dept. of Justice, Washington, D.C., submitted for appellee. With her on the brief was David M. Cohen.

Before MAYER and CLEVENGER, Circuit Judges, and SMITH, Senior Circuit Judge.

## OPINION

MAYER, Circuit Judge.

These are consolidated appeals from two separate decisions of the General Services Administration Board of Contract Appeals. SMS Data Products Group, Inc. (SMS) appeals the board's July 20, 1990, decision ordering Sears, Roebuck & Company's (Sears') contract with the Department of the Treasury (Treasury) terminated for the convenience of the government, but refusing to direct an award to SMS. *Sysorex Information Sys., Inc.*, GSBCA Nos. 10642–P, 10644–P, 10656–P, 90–3 B.C.A. (CCH) ¶ 23,181, 1990 WL 105795 (1990) (July 20 decision).* SMS also appeals the board's October 23, 1990, decision that Treasury's subsequent amendment of the solicitation and request for a new round of best and final offers was in accordance with the July 20 decision. *SMS Data Products Group, Inc.*, GSBCA No. 10864–P, 91–1 B.C.A. (CCH) ¶ 23,464, 1990 WL 163376 (Oct. 23, 1990) (October 23 decision). We affirm both decisions.

### Background

Treasury issued solicitation number A–88–07 on April 28, 1988. It requested proposals for the Departmental Microcomputer Acquisition Contract (DMAC–II), an indefinite delivery, indefinite quantity contract to furnish microcomputer equipment and related services for all twelve Treasury agencies through fiscal year 1992. 90–3 B.C.A. at 116,362. In essence, Treasury wanted the successful offeror to assemble a "supermarket" of computer hardware, software, and services from which its twelve agencies could fill their automated data processing requirements.

The range of goods and services specified is enormous. It includes microcomputers of various capabilities and configurations, as well as expansion components and peripheral devices; applications and networking software; and both support and value-added services such as installation, configuration, hot-line support, and maintenance. Section C of the solicitation outlines extensive technical requirements that are both "minimum" and "mandatory"; only proposals meeting all mandatory solicitation requirements are eligible for award. *Id.* The section also emphasizes that "[a] major feature over the contract life will be a high degree of flexibility in terms of technological change." The contract's stated minimum value is $50,000, its evaluated value some $228 million, and its maximum value $400 million. *Id.*

Sears, SMS, Sysorex Information Systems, Inc. (Sysorex), and Falcon Microsystems, Inc. (Falcon) submitted proposals that the contracting officer deemed compliant with mandatory solicitation requirements and "substantially equal" in technical merit. *Id.* at 116,363. Because the solicitation provided that price would determine which compliant proposal among those with substantially equal technical scores would be selected, and because Sears had the lowest evaluated price—SMS was a close second, Sysorex third, and Falcon fourth—Treasury awarded Sears the contract on May 11, 1990. *Id.* SMS, Sysorex, and Falcon separately asked the board to set the award aside, *see* 40 U.S.C. § 759(f)(1) (1988), but all relied on the same ground: the technical noncompliance of Sears' proposal. Sears intervened in each of the protests on the side of Treasury and the board consolidated them.

The board determined "that Sears' proposal did not comply with ten separate mandatory requirements." 90–3 B.C.A. at 116,372. Two of the requirements—that the awardee provide a UNIX-like operating system for the Intel 80386 microprocessors as well as an 80386–based laptop computer weighing no more than sixteen pounds— were especially significant. The former "has considerable impact on both the capabilities of the computers which would be affected and the estimated price of the

---

* Sears, too, originally challenged the July 20 decision in an appeal docketed as No. 91–1022. However, pursuant to a settlement agreement resolving a related protest—approximately two weeks after oral argument in these appeals, on May 17, 1991, Treasury rewarded the contract to Sysorex and Sears protested that award—we granted Sears' motion for voluntary dismissal on June 28, 1991. *See* Fed.R.App.P. 42(b).

contract," *id.,* and the latter "affects Treasury's primary consideration with regard to nearly one-quarter of all computers estimated to be ordered under the contract," *id.* at 116,373. The board concluded that these two shortcomings were "sufficient, in themselves, to invalidate the award." *Id.*

Nevertheless, it proceeded to detail eight other failings ranging from faulty connecting hardware to incompatible software. *Id.* at 116,373. It concluded,

> Treasury now must "face an unpleasant truth: of two critical assumptions on which award was based—that the solicitation accurately states the Government's true requirements, and that Sears's offer meets the Government's needs—only one is correct." We are not in a position to determine Treasury's minimum needs. We therefore direct the agency to reexamine its needs and then do one of two things: If those needs remain as stated in the solicitation at the time that best and final offers were requested, and the solicitation accurately states those requirements, the agency shall award the contract to the lowest-priced, fully compliant, responsible offeror. If Treasury determines, however, that its requirements are actually different from those previously stated, the agency shall revise the requirements stated in the solicitation and permit further competition against the modified specifications.

*Id.* at 116,375 (citation and footnote omitted).

Treasury chose the latter course. It reexamined its needs, determined they had changed, and amended the solicitation accordingly. 91–1 B.C.A. at 117,716. Amendment 18, issued on October 1, embodies the changes; principal among them are the elimination of all Motorola 68xxx microcomputers, a shift in estimated ordering patterns away from contract years one and two toward years three and four, and an advance in the date by which offered laptop computers must be commercially available. *Id.* In light of these and other changes, as well as revisions to the estimated quantities of some items to be ordered, Treasury invited a new round of best and final offers.

SMS complained to the board that Treasury's actions were not in accordance with the July 20 decision. In particular, it argued that the changes were "illusory," that amendment 18 was therefore unnecessary, and that, as the second-lowest priced offeror who complied with the previous solicitation, it should have received the award. Citing sealed-bid procurement cases from our sister circuits which directed contract awards to the lowest responsive, responsible bidders pursuant to the Administrative Procedure Act, *see, e.g., Ulstein Maritime, Ltd. v. United States,* 833 F.2d 1052, 1058 (1st Cir.1987); *Choctaw Mfg. Co., Inc. v. United States,* 761 F.2d 609, 619 (11th Cir.1985); *Superior Oil Co. v. Udall,* 409 F.2d 1115, 1121 (D.C.Cir.1969); *cf. Delta Data Systems Corp. v. Webster,* 744 F.2d 197, 204 (D.C.Cir.1984), SMS again asked the board to order Treasury to award it the contract.

The board again declined. Relying on uncontested facts, it found that each of the three principal changes was material because each could "alter the offerors' approach to writing proposals, including the pricing of products." 91–1 B.C.A. at 117,719. It distinguished the sealed-bid procurement cases cited by SMS, and described prior negotiated procurement cases in which it had directed awards as instances where "there were only two effective competitors and it was clear that the result of the violation of law was deprivation of a rightful award." *Id.* at 117,717. It concluded that where, as here, the agency's requirements were in question, it "should be chary about assuming the contracting officer's prerogative of making an award" because the law prohibits it from interfering with an agency's determination of its individual automated data processing requirements. *Id.* at 117,718 (citing 40 U.S.C. § 759(e) and quoting *Data General Corp. v. United States,* 915 F.2d 1544 (Fed. Cir.1990)).

*Discussion*

SMS raises two related objections to the board's decisions: that the board erred as a

matter of law both in refusing to direct award to SMS after determining that Sears was ineligible, and in holding that Treasury had authority to issue amendment 18 and request a second round of best and final offers.

## A.

The Brooks Act does not expressly authorize the board to direct the award of a contract to a successful protestor. The board may only "suspend, revoke, or revise the procurement authority of the Administrator or the Administrator's delegation of procurement authority applicable to the challenged procurement," 40 U.S.C. § 759(f)(5)(B), "declare an appropriate interested party to be entitled to the costs of filing and pursuing the protest, including reasonable attorney's fees, and bid and proposal preparation," *id.* § 759(f)(5)(C), and "order any additional relief which it is authorized to provide under any statute or regulation," *id.* § 759(f)(6)(C). We are aware of no statute or regulation authorizing the board to direct the award of a contract.

■ Nor is there any precedent suggesting that a board of contract appeals has such authority, whether in a sealed-bid or in a negotiated procurement. Indeed, *dictum* from the Court of Claims suggests the contrary. *See Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 598 (1980). The *Ulstein Maritime, Choctaw Mfg., Delta Data,* and *Superior Oil* cases cited by the board for "the well-established principle that when it is clear that but for the violations we have found, the contract would have been awarded to the protestor, the appropriate relief is to direct the agency to make an award to that firm," 91-1 B.C.A. at 117,717, all involved a *district court's* authority under the *Administrative Procedure Act.* But the board, unlike a district court, has only the authority expressly granted it by law, rule, or regulation, *see Electronic Data Systems v. General Servs. Admin.,* 792 F.2d 1569, 1579 (Fed.Cir.1986); *see also ViOn Corp. v. United States,* 906 F.2d 1564, 1567 (Fed. Cir.1990), and the Administrative Proce-

dure Act differs from the Brooks Act in obvious and important respects, *compare* 5 U.S.C. §§ 701–06 (1988) *with* 40 U.S.C. § 759(f). Accordingly, these nonprecedential opinions are a thin reed on which to base a rather far-reaching authority.

■ Resolution of the issue, however, awaits another day—under the "but for" standard assumed by the board and the parties, we agree that SMS was not entitled to the contract. In light of the July 20 decision, SMS became one of three potential awardees. That its proposal was the lowest-priced of those remaining did not dictate that it receive the contract. To the contrary, because the board found that at least three of the changes made by amendment 18 could alter the offerors' pricing of products, it could not say that SMS would remain the second-low offeror. 91-1 B.C.A. at 117,719. We agree. On this record, the board could not have foreclosed all of Treasury's options save one: awarding the contract to SMS. *Cf., e.g., Delta Data,* 744 F.2d at 205 (refusing to direct award in negotiated procurement where only *one* offeror remained and noting that, if originally accepted proposal had been rejected for technical noncompliance instead of nonresponsibility, agency could have modified solicitation to take account of proposal's desirable features rather than awarding to remaining offeror under the original solicitation).

## B.

SMS alleged but did not prove that the amendment 18 changes were illusory: it did not contest here or before the board the facts supporting Treasury's claim of changed needs. *See* 91-1 B.C.A. at 117,-716. Indeed, it concedes the validity of the rationale Treasury relied on in advancing the commerciality date of the laptop computers—rapid technological change in the computer industry—a change affecting nearly one-fourth of the computers estimated to be purchased under the DMAC–II and, consequently, one of the three solicitation changes the board considered "material." *Id.* at 117,719. That the solicitation specified a "major feature" of the DMAC–

II would be a "high degree of flexibility in terms of technological change" bolsters the board's finding.

██ The board concluded:

In reexamining its needs, ... the agency did not stop with ... all of the requirements that Sears did not meet. Treasury went on to investigate the demands of all of its bureaus for all of the products covered by the DMAC–II solicitation. As a result of that more complete investigation, the agency found that the solicitation should be changed in other ways, as well.

Although we did not have in mind such a complete study when we issued our July 20 order, we certainly did not preclude it, either. The order was to reexamine needs, and the fact that the reexamination was exhaustive indicates not that the agency has taken a prohibited action, as SMS contends, but rather, that the agency is taking seriously its purpose in conducting this procurement.

*Id.* at 117,718. We agree that amendment 18 was within the scope of the July 20 order. The order directed Treasury to reexamine its needs and authorized it to revise the solicitation and permit further competition in the event those needs had changed. 90–3 B.C.A. at 116,375–76. That is what happened.

██ The regulations governing negotiated procurements also authorized Treasury's action. We previously have noted the broad discretion they reserve to the contracting officer. *See Burroughs Corp.,* 617 F.2d at 598. For example, 48 C.F.R. § 15.606(a) (emphasis added) provides: "When, *either before or after receipt of proposals,* the Government changes, relaxes, increases, or otherwise modifies its requirements, the contracting officer *shall* issue a written amendment to the solicitation." Subsection (b)(4) requires cancellation of the original solicitation and issuance of a new one only where the "change is so substantial that it warrants complete revision of a solicitation." The board did not make and the record does not support such a finding here. SMS concedes as much when it argues that the changes embodied

in the amendment are "illusory" and do not even warrant reopening discussions and requesting new best and final offers. However, § 15.611(c) specifically authorizes the contracting officer to reopen discussions after receipt of best and final offers when "it is clearly in the Government's interest to do so"; if she does, she *"shall* issue an additional request for best and final offers to all offerors still within the competitive range." 48 C.F.R. § 15.611(c) (emphasis added). Once Treasury determined that its bona fide needs in fact had changed, we think it was "clearly in the Government's interest" to reopen discussions—that is, to "permit further competition," 90–3 B.C.A. at 116,376—to comply with a valid board order to the same effect.

### Conclusion

Accordingly, the decisions of the board are affirmed.

AFFIRMED.